IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

LEGGETT & PLATT, INC.          §
                               §
VS.                            §   CIVIL ACTION NO.4:06-CV-366-Y
                               §
THE YANKEE                     §
CANDLE COMPANY                 §

ORDER PARTIALLY GRANTING AND
PARTIALLY DENYING MOTION FOR SUMMARY JUDGMENT

This case arises out of a series of business transactions
between plaintiff Leggett & Platt, Incorporated ("Leggett"), and
defendant The Yankee Candle Company ("Yankee Candle") for the
purchase and delivery of custom-manufactured millwork, fixtures,
and lightweight shelving for several of Yankee Candle's retail
establishments located throughout the United States. Yankee Candle
has brought counterclaims against Leggett for breach of contract,
breach of warranty, fraud, and unfair and deceptive trade prac-
tices. Leggett has moved (doc. #37) for summary judgment on Yankee
Candle's counterclaims that address its purchase of lightweight
shelving for its retail stores from Leggett.[1] After review, the
Court concludes that only Counts I and II of Yankee Candle's
breach-of-contract claims should be dismissed.

---

[1] The particular counterclaims are: Counts I and II (breach of contract);
Counts IV, V, and VI (breach of warranty); Count VII (fraud); and Counts VIII, IX,
and X (deceptive trade practices).

I.   Factual Background[2]

Yankee Candle is a Massachusetts corporation that manufactures premium scented candles for sale in numerous retail establishments throughout the United States.  Leggett is a Missouri corporation with numerous subdivisions located throughout the United States. It designs and manufactures, through its various subdivisions, custom shelving, fixtures, and millwork for use in retail establishments.  Since 2000, Yankee Candle had been purchasing custom millwork and fixtures for its various retail stores from two of Leggett's subdivisions.

In the summer of 2004, Yankee Candle informed Leggett and several other of Yankee Candle's millwork vendors that it was seeking a lightweight display shelf for its satellite stores and its Flagship II store that were scheduled to open in 2005.  Yankee Candle informed all of the millwork vendors that it preferred to purchase all of the lightweight shelving from the same vendor if possible.

In November 2004, Leggett informed Yankee Candle that it had developed a lightweight shelf to sell to Yankee Candle.  As part of its sales pitch, in January 2005 Leggett brought samples of the lightweight shelves to Yankee Candle's headquarters in South Deerfield, Massachusetts, for inspection.  The inspection included

_____

[2]  Because Leggett has moved for summary judgment, the Court views the facts in light most favorable to Yankee Candle.

Yankee Candle's cutting open the shelves, revealing that the shelves were made with a plywood frame with metal hat-shaped channels running the length of the shelf and installed against the plywood frame. Between the channels was a cardboard honeycomb filler and, glued to the frame, was a laminated veneer. In February 2005, Yankee Candle informed Leggett that it was happy with the design and cost of the lightweight shelves and that it had decided to purchase the shelves from Leggett.

Shortly thereafter, Yankee Candle issued purchase orders for the lightweight shelves for approximately thirty of its satellite stores and for its Flagship II store. Each purchase order contained the following paragraph:

> **10.  Warranties**: In addition to any other express or implied warranties, Seller warrants that all products delivered hereunder will be merchantable, new, suitable for the uses intended, of the grade and quality specified free from all defects in design, material and workmanship, will conform to all samples, drawings, descriptions and specifications furnished, and will be free of liens and encumbrances . . . . These warranties shall survive any delivery, inspection, acceptance, payment or resale of the products and shall extend to Buyers and Buyer's customers. These warranties shall be construed as conditions as well as warranties and shall not be deemed to exclude Seller's standard warranties or other rights or warranties which Buyer may have or obtain.  At its expense and option, Seller shall replace or repair any products not conforming to the foregoing warranties . . . . If after notice Seller fails promptly to replace or repair any such product . . ., Seller shall promptly refund to Buyer the full

purchase price paid by Buyer for all such products.

(Def.'s App. at 9.)  After receiving each purchase order, Leggett manufactured the shelves and delivered them to Yankee Candle.  In total, Leggett manufactured between 8000 and 10,000 lightweight shelves for thirty of Yankee Candle's satellite stores located throughout the United States and for its Flagship II store located in Williamsburg, Virginia.[3]

The lightweight shelves were manufactured by a Leggett subdivision called Indiana Chair Frame.  The shelves were first manufactured using plywood just as Leggett had shown to Yankee Candle when it provided samples for inspection.  But in June 2005, Indiana Chair Frame changed the wood framework from plywood to particle board.  It is unknown how many of the shelves shipped to Yankee Candle stores were made of plywood or particle board.  Yankee Candle was never made aware of the design change.  Further, the laminate veneer concealed the change making it nearly impossible to discover without cutting open the shelf.

In late November 2005, several of the lightweight shelves began delaminating, meaning the laminate veneer began separating from the wood frame.  The shelves that delaminated included shelves manufactured with plywood and particle board.  It is not disputed

---

[3]  Yankee Candle states Leggett supplied approximately 8000 shelves while Leggett contends it supplied approximately 10,000 shelves.

that a latent defect in the shelf caused it to delaminate.[4]   To
date, Yankee Candle has discovered 117 shelves that have delami-
nated.[5]

Yankee Candle inspected the delaminated shelves and learned
they were made of particle board instead of plywood.   After
examining the shelves, Yankee Candle found that the adhesive
holding the laminate veneer to the particle-board frame failed.  It
was observed in several of the defective shelves that the metal hat
channel had pushed between the laminate veneer and the frames.
Yankee Candle measured the size of the hat channel with a microme-
ter and found that the hat channel was thicker than the inside
space between the laminate on the top and bottom of the shelf.
Yankee Candle concluded this caused the hat channel to be com-
pressed during the lamination process and placed it under stress.
Due to the weight of the product and the stress on the compressed
hat channel, Yankee Candle believed that the hat channel relieved
its compression and expanded the laminate causing the delamination.
Thus, Yankee Candle concluded that "the delamination problem . . .
was caused by the change from plywood frames to particle-board

---

[4] Leggett does not dispute that a defect caused the shelves to delaminate.
Leggett does dispute that the change from plywood to particle board caused or
contributed to the delamination.

[5] Yankee candle stresses that only 117 defective shelves have been discovered
thus far.  Yankee Candle contends that this may not represent the total number of
defective shelves because "all delaminated shelves are [not] readily identifiable
as the weight of merchandise placed on the shelves will conceal the fact that the
surface has delaminated." (Pl.'s App. at 9.)

frames and the size of the metal hat channel." (Def.'s App. at 36.)

On December 5, 2005, Yankee Candle notified Leggett that several if its lightweight shelves had delaminated. Ten days later, Yankee Candle informed Leggett "that the particle-board framed shelving was not what Yankee Candle ordered from Leggett . . . [and] that the delamination was caused, in part, by the lack of adhesion of the laminate veneer to the particle-board frame." (*Id.*) Five days later, Yankee Candle "notified Leggett that [it] considered all of the particle-board framed lightweight shelves delivered by Leggett . . . to be defective." (*Id.* at 39.)

Beginning in March 2006, Leggett delivered 500 46" inch replacement shelves and 120 22" inch replacement shelves at no cost to Yankee Candle. In 2007, Leggett delivered forty-nine replacement shelves to Yankee Candle's Staten Island, New York, store and twenty-five replacement shelves to Yankee Candle's Hamburg, New York, store, again, at no cost to Yankee Candle. The parties have not presented any evidence as to whether the replacement shelves were plywood framed and particle-board framed.

II.  Analysis

A.  Summary-Judgment Standard

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to

6

judgment as a matter of law," summary judgment is appropriate. FED. R. CIV. P. 56(c).  An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir. 1945)). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material.  *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990).  Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party.  *Id.*; *Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990); *Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir. 1989).   In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988).  Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992).  Thus, parties should "identify specific evidence in the

record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the Court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). A defendant or, as here, a counterdefendant, moving for summary judgment may submit evidence that negates a material element of the counterplaintiff's claim or show that there is no evidence to support an essential element of the counterplaintiff's claim. *See Celotex Corp.*, 477 U.S. at 322-24; *Crescent Towing and Salvage Co. v. M/V Anax*, 40 F.3d 741, 744 (5th Cir. 1994); *Lavespere*, 910 F.2d at 178.

To negate a material element of the counterplaintiff's claim, the counterdefendant must negate an element that would affect the outcome of the action. *See Anderson*, 477 U.S. at 247. If the counterdefendant moves for summary judgment alleging no evidence to support an essential element of the counterplaintiff's claim, the counterdefendant need not produce evidence showing the absence of a genuine issue of fact on that essential element. Rather, the counterdefendant need only show that the counterplaintiff, who

bears the burden of proof, has adduced no evidence to support an essential element of his case. *See Celotex*, 477 U.S. at 325; *Teply v. Mobil Oil Corp.*, 859 F.2d 375, 379 (5th Cir. 1988).

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing *Celotex*, 477 U.S. at 324); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50.

## B.  Discussion

### 1.  Breach-Of-Contract Claims

Leggett argues that summary judgment should be entered on Counts I and II of Yankee Candle's breach-of-contract claims regarding the contract for lightweight shelving "because Yankee Candle's claims are based on the receipt of defective or nonconforming goods" and therefore its "claims are for breach of

warranty, not breach of contract."[6]  (Pl.'s Br. at 4.)  Leggett
contends that "breach-of-contract remedies are available to a buyer
when the seller fails to make any delivery" whereas "breach-of-
warranty remedies are available to a buyer who has received and
accepted goods, but discovers they are defective in some manner."
(*Id.*)  Because Leggett has delivered the lightweight shelves to
Yankee Candle and Yankee Candle has accepted them, Leggett argues,
Yankee Candle is foreclosed from asserting a breach-of-contract
claim.

Yankee Candle contends that the lightweight shelves' defect
(the delamination) and nonconformity (the change to particle board)
were latent, preventing its discovery when Leggett delivered the
shelves.  Yankee Candle argues that where a buyer accepts goods
that contain a latent defect and nonconformity, the buyer may
revoke his acceptance within a reasonable time after their
discovery.  When it discovered the defect and the nonconformity,
Yankee Candle contends that it immediately notified Leggett and
maintains that it "has offered evidence that it revoked its

---

[6]  In its counterclaim, Yankee Candle's breach-of-contract claims read as
though they encompass more than just the contract between it and Leggett for
lightweight shelving.  For example, Count I includes "fixtures and lightweight
shelving" and Count II only mentions "fixtures."  In its counterclaim, Yankee Candle
complains that in July 2005, "the adjustable legs on fixtures shipped by Leggett to
the satellite stores began collapsing, causing the fixtures themselves to collapse."
In the joint pretrial order, however, Yankee Candle makes no mention of defective
adjustable legs or any other defective fixtures other than the lightweight shelving.
Therefore, to the extent Counts I and II of Yankee Candle's breach-of-contract claims
encompass any fixtures beyond the contract for the lightweight shelving, the Court
concludes that Yankee Candle had abandoned those claims.  *See Elvis Presley Enter-
prises, Inc. v. Capece,* 141 F.3d 188, 206 (5th Cir. 1998)("It is a well settled rule
that a joint pretrial order signed by both parties supersedes all pleadings and
governs the issues and evidence to be presented at trial . . . .").

acceptance once it determined that the shelves were defective and nonconforming." (Def.'s Br. at 11.) Yankee Candle argues that whether its revocation of acceptance of the shelves was reasonable and done within a reasonable time after learning of the shelves' defects and nonconformity is a question of fact for the jury.

Leggett counters that "Yankee candle has failed to produce any evidence that it revoked its acceptance." (Pl.'s Reply at 2.) Leggett contends that the only evidence of revocation offered by Yankee Candle consists of a "statement by . . . one of its employees that '[o]n December 20, 2005, I notified Leggett that Yankee Candle considered all of the particle-board framed light-weight shelves delivered by Leggett to Yankee Candle to be defective.'" (*Id.*) Leggett argues, "This statement is not evidence that Yankee Candle revoked acceptance of the shelves." (*Id.*)

Because the contract between Leggett and Yankee Candle is a contract for the sale of goods, article two of the Uniform Commercial Code ("UCC") governs this case. *See* TEX. BUS. & COM. CODE § 2.102; *Selectouch Corp. v. Perfect Starch, Inc.,* 111 S.W.3d 830, 834 (Tex.App. [5th Dist.] 2003, no pet.)("Contracts relating to the sale of goods are governed by article two of the [UCC] . . . ."). Under the UCC, breach-of-contract and breach-of-warranty claims are not the same causes of action. *Southwestern Bell Telephone Company v. FDP Corp.,* 811 S.W.2d 572, 576 (Tex. 1991). Generally, a breach of contract occurs when a seller fails to deliver as promised.

*Chilton Insurance Company v. Pate & Pate Enterprises, Inc.,* 930 S.W.2d 877, 890 (Tex.App.——San Antonio 1996, writ denied). Conversely, a breach of warranty occurs when the seller delivers nonconforming or defective goods. *Id.* The "critical factor," however, in determining whether a buyer has a breach-of-contract or a breach-of-warranty claim "is whether the buyer has finally accepted the goods." *Selectouch Corp.,* 111 S.W.3d at 834. Once a buyer finally accepts the goods and can no longer revoke that acceptance, he is limited to recovering under section 2.714 of the UCC for breach of warranty if the goods are defective or nonconforming. *Id.; see also Toshiba Machine Co., America v. SPM Flow Control, Inc.,* 180 S.W.3d 761, 771 (Tex.App.——Fort Worth [2nd Dist.] 2005, pet. granted, judgm't vacated w.r.m.)("a buyer's rejection or acceptance of nonconforming [or defective] goods determines the remedies available to him")[7]; *Trident Steel Corp. v. The Wiser Oil Co.,* 223 S.W.3d 520, 526 (Tex.App.——Amarillo [7th Dist.] 2006, pet. denied)("It is the buyer's acceptance or rejection of goods [that] determines the remedies available to the buyer, not the seller's mere delivery of something.").

A buyer accepts goods if he agrees to accept them despite their defect or nonconformity, he fails to make an effective

---

[7] The Texas supreme court vacated the court of appeals judgment without regard to the merits of its decision and remanded for implementation of a settlement agreement. Thus, the supreme court's disposition did not vacate or disapprove of the court of appeals opinion. *See Houston Cable TV, Inc. v. Inwood West Civic Ass'n.,* 860 S.W.2d 72, 73 (Tex. 1993); Tex. R. App. P. 56.3.

rejection, or does any act that is inconsistent with the seller's ownership in the goods. *Toshiba Machine Co.,* 180 S.W.3d at 771 (citing Tex. Bus. & Com. Code § 2.606). In particular, section 2.606 provides,

> (a) Acceptance of goods occurs when the buyer
>
> (1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
>
> (2) fails to make an effective rejection (Subsection (a) of Section 2.602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> (3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

"Where a buyer accepts goods without knowledge of a nonconformity [or defect], the buyer may revoke [his] acceptance if acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." *Toshiba Machine Co.,* 180 S.W.3d at 772 (citing UCC section 2.609(a)(2)). Revocation of acceptance must occur within a reasonable time after the buyer discovers the grounds that permit him to revoke his acceptance. *Id.* (citing UCC section 2.608(b)). "A buyer who rightfully rejects the goods or justifiably revokes his acceptance may recover breach-of-contract remedies for delivery of nonconforming [or defective]

goods under section 2.711" of the UCC. *Selectouch Corp.,* 111 S.W.3d at 834.

Under section 2.602(a) of the UCC, a buyer's rejection "must be within a reasonable time after" the delivery or tender of delivery of the goods and "it is ineffective unless the buyer seasonably notifies the seller." Revocation of an acceptance under section 2.608 of the UCC does not require the buyer to tender the goods to the seller; "it is sufficient that the buyer seasonably notifies the seller of his intention to revoke acceptance." *Vista Chevrolet, Inc. v. Lewis,* 704 S.W.2d 363, 369 (Tex.App.——Corpus Christi 1985), *rev'd in part on other grounds,* 709 S.W.2d 176 (Tex. 1986). "The determination of whether the actions of the buyer under sections 2.602 and 2.606 amount to acceptance or an effective rejection in a particular case is generally made by the trier of fact." *Pacific Products, Inc. v. Great Western Plywood, Ltd.,* 528 S.W.2d 286, 295 (Tex.App.——Fort Worth 1975, no writ). And "whether rejection or revocation occurred within a reasonable time depends on the facts of a particular case" and is generally considered a question of fact for the jury. *Toshiba Machine Co.,* 180 S.W.3d at 772; *Purnell v. Guaranty Bank,* 624 S.W.2d 357, 359 (Tex.App.——Dall- as 1981, no writ).

Thus, to prevail on its quest for summary judgment on Counts I and II of Yankee Candle's breach-of-contract claims, Leggett must show that there is no genuine issue of material fact that Yankee

Candle has finally accepted the shelves despite their defect and nonconformity. To achieve this, Leggett has the burden to negate the existence of any fact or circumstance that would show Yankee Candle effectively revoked its acceptance of the lightweight shelves.[8] The Court concludes that Leggett has met its burden.

The evidence undisputably shows that Leggett delivered the shelves to Yankee Candle and Yankee Candle accepted them. The evidence also undisputably shows that Yankee Candle accepted the shelves unaware that some of the shelves contained a defect and unaware that others were not made in accordance with the original agreed-upon design. But Yankee Candle has not produced any evidence that it seasonably notified Leggett that it intended to revoke its acceptance. Yankee Candle claims it notified Leggett that it revoked its acceptance, but according to its own evidence Yankee Candle only told Leggett "that [it] considered all of the particle-board framed lightweight shelves delivered by Leggett . . . to be defective." (Def.'s App. at 39.) That statement is insufficient to seasonably notify Leggett of Yankee Candle's intention to revoke its acceptance of the shelves.

Further, Yankee Candle does not contest that Leggett has shipped to it, at no cost, nearly 700 replacement shelves. Yankee Candle does not present any evidence, mush less even allege, that

---

[8] Both sides agree that Leggett delivered the shelves and that Yankee Candle initially accepted. Yankee Candle claims it revoked its acceptance and Leggett denies that Yankee Candle revoked.

these replacement shelves contained any defects or nonconformities or that it has declined to accept them. In fact, there is no evidence to indicate whether the replacement shelves were made of plywood or particle board. Moreover, the evidence shows that after learning of the shelves' defects and nonconformities, Yankee Candle continued to use the shelves, only notified Leggett of the defects and of their nonconformities, failed to notify Leggett it intended to revoke its acceptance of the shelves, and accepted replacement shelves from Leggett.

Finally, the Court notes that in its counterclaim complaint, Yankee Candle never alleged that it revoked its acceptance of the shelves nor did it allege any facts that raised revocation as a fact in issue. In its complaint, Yankee Candle alleged:

> In or about June of 2005, the lamination on the lightweight shelving delivered to several satellite stores began detaching from the shelf frame and core. Yankee Candle discovered that at some point in 2005, Leggett changed the design and manufacturing of the shelves. Among other changes made by Leggett was replacing the plywood frame with a particle-board frame, and reducing the shelf thickness.
>
> . . .
>
> Yankee Candle immediately notified Leggett of the defective [lightweight] shelving . . . .

(Def.'s Counterclaim Compl. at 6.) It wasn't until the joint pretrial order that Yankee Candle claimed "it immediately notified

[Leggett] that the shelves did not conform to the samples, and revoked its acceptance of them." (Joint Pretrial Order at 4.)

In *Purnell,* the question before the Texas court of appeals was "whether the determination that the passage of time between the date of purchase and the date of revocation of acceptance [was] reasonable, as required by section 2.608, is a question of fact or law." 624 S.W.2d at 358. In that case, it was undisputed that thirty months had lapsed between the time of sale and the notice of revocation of acceptance. *Id.* at 359. The court of appeals held that whether the buyer's delay in notifying the seller of revocation of acceptance was unreasonable was a question of fact and that "to prevail on summary judgment in defense of such a plea, the movant has the burden to negate the existence of facts or circumstances [that] would excuse the delay." *Id.* The court of appeals reversed a trial court's entry of summary judgment even though there was no "proof of the specific facts and circumstances [that] provoked the act of revocation . . . ." *Id.* Purnell simply submitted an affidavit that contained conclusory statements in support of his opposition to summary judgment. *Id.* The court of appeals concluded that a genuine issue of material fact existed, however, because Purnell's "complaint raised the fact issue of the timelines of revocation." *Id.; see also* FED. R. CIV. P. 56(c)("The judgment sought shall be rendered forthwith if the **pleadings**, depositions, answers to interrogatories, and admissions on file,

together with affidavits, if any, show that there is no genuine issue as to any material fact . . . .")(Emphasis added).

Here, Yankee Candle's counterclaim complaint does not allege that it revoked its acceptance of the shelves once it learned that they contained a defect and were nonconforming.  Nor does it allege any facts suggesting there is a genuine issue of material fact as to whether it revoked its acceptance of the shelves and seasonably notified Leggett of its revocation.  Yankee Candle simply alleged that it "immediately notified Leggett of the defective shelving." And although it alleged that it immediately notified Leggett that it had revoked its acceptance of the shelves for the first time in the joint pretrial order, Yankee Candle alleged no facts to support its claim; it's merely a conclusory statement. In light of the fact that its best evidence that it seasonably notified Leggett of its revocation of acceptance is that it told Leggett it considered all of the particle-board framed lightweight shelves to be defective, Yankee Candle's conclusory statement in the joint pretrial order is insufficient to establish a genuine issue of material fact as to whether it revoked its acceptance and whether it seasonably notified Leggett of its revocation in accordance with sections 2.602, 2.606, and 2.608 of the UCC.  Therefore, the Court concludes that Leggett has met its burden of negating any fact that could place the issue of Yankee Candle's revocation in issue and its

entitled to summary judgment on Counts I and II of Yankee Candle's

breach-of-contract claims.

## 2. Breach-of-Warranty Claims

Leggett contends that it is entitled to summary judgment in its favor on Yankee Candle's breach-of-warranty claims[9] because "the change from plywood to particle board did not affect the performance or appearance of the shelves." (Pl.'s Br. at 5.) Leggett contends that "there is no evidence that [it] breached an express warranty or that the shelves and fixtures were not merchantable or fit for a particular purpose." (*Id.*) "Therefore," Leggett argues, "there was no breach of any warranty related to the change of wood in the shelves or any of the fixtures." (*Id.*)

Alternatively, Leggett contends that it is entitled to summary judgment because there is no evidence that Yankee Candle has suffered any damages. Leggett contends that it has "supplied Yankee Candle with significantly more replacement shelves than the number of shelves that have delaminated, at no cost to Yankee Candle." (*Id.*) "Therefore," Leggett argues, Yankee Candle "has not been damaged." (*Id.* at 5-6.)

Yankee Candle responds that Leggett breached its express warranty with Yankee Candle when it delivered lightweight shelves manufactured out of particle board. Yankee Candle also contends that there is evidence Leggett breached its express and implied warranties by delivering defective shelves. Yankee Candle argues that it is entitled to incidental and consequential damages as a

---

[9]  Counts IV, V, and VI of Yankee Candle's counterclaim complaint.

result of Leggett's breach of warranty. Yankee Candle contends
that it incurred labor costs in replacing the defective shelves,
travel costs when its project managers were required to travel to
its satellite stores to inspect the shelves, and shipping costs
when it shipped many of the defective shelves to its headquarters
for further inspection.

Leggett argues in reply that its change from plywood to
particle board improved the "machinability/aesthetics of the
perimeter edge in preparation for edgebanding." (Pl.'s Reply at
3.) Leggett contends that the change did not affect the shelves'
fit, form, or function and, thus, was not a material change.
Leggett further argues that the change from plywood to particle
board did not lessen the value of the shelves. And Leggett argues
that Yankee Candle has failed to provide any evidence of travel
expenses or shipping costs, failed to provide that information
during discovery, and failed to show that but for its breach of
warranty, Yankee Candle has incurred additional labor costs.
Leggett contends that "Yankee Candle would have incurred the cost
of paying its employees their hourly wages to perform their regular
duties regardless of the replacement of the defective shelves."
(*Id.* at 7.)

First, the Court concludes that Yankee Candle has demonstrated
that there is a genuine issue of material fact as to whether

Leggett breached its express warranty.  Under section 2.313 of the

UCC:

> (a)  Express warranties by the seller are
> created as follows:
>
> (1) Any affirmation of fact or promise
> made by the seller to the buyer which relates
> to the goods and becomes part of the basis of
> the bargain creates an express warranty that
> the goods shall conform to the affirmation or
> promise.
>
> (2) Any description of the goods which is
> made part of the basis of the bargain creates
> an express warranty that the goods shall
> conform to the description.
>
> (3) Any sample or model which is made
> part of the basis of the bargain creates an
> express warranty that the whole of the goods
> shall conform to the sample or model.
>
> (b) It is not necessary to the creation of an
> express warranty that the seller use formal
> words such as "warrant" or "guarantee" or that
> he have a specific intention to make a war-
> ranty, but an affirmation merely of the value
> of the goods or a statement purporting to be
> merely the seller's opinion or commendation of
> the goods does not create a warranty.

Yankee Candle's purchase orders for the lightweight shelving

contained a warranty provision wherein the seller promised that

"all products delivered hereunder . . . [would] conform to all

samples . . . furnished . . . ." (Def.'s App. at 9.) Leggett does

not dispute that the sample lightweight shelving it provided to

Yankee Candle as part of its inducement to gain Yankee Candle's

business was made with a plywood frame.  Leggett also does not

dispute that after Yankee Candle sent its purchase orders, Leggett changed the design of the shelf using a particle-board frame. This did not conform to the sample provided by Leggett and, therefore, did not conform to Leggett's express warranty.[10]

Next, the Court concludes that Yankee Candle has demonstrated that there is a genuine issue of material fact as to whether Leggett's defective and nonconforming lightweight shelves breached express and implied warranties. Although Leggett claims that the change from plywood to particle board did not cause or was not a contributing cause to the delamination, did not affect the value of the shelves, and improved the shelves' "machinability/aesthetics," it has offered no competent summary-judgment evidence to support those conclusory statements. On the other hand, Yankee Candle has produced competent summary-judgment evidence that suggests the change from plywood to particle was, at the very least, a contributing factor in the shelves' delamination.

---

[10] Leggett argues that the terms of Yankee Candle's purchase orders are not binding on it and did not become a part of the contract between the parties. This argument, however, first appeared in Leggett's reply brief. This Court will not consider arguments raised for the first time in a reply brief. *See Senior Unsecured Creditors' Comm. of First Republicbank Corp. v. FDIC*, 749 F. Supp. 758, 772 (N.D.Tex. 1990)(Fitzwater, J.). Nevertheless, the Court concludes that there is a genuine issue of material fact as to whether the terms of Yankee Candle's purchase orders are binding on Leggett and are terms of their contract. According to the summary-judgment evidence, Yankee Candle's purchase orders were an offer to Leggett to purchase a certain amount of lightweight shelving in accordance with the samples Leggett had provided. When Leggett manufactured and delivered the shelves to Yankee Candle, it had accepted Yankee Candle's offer as well as the terms in the purchase order. *See* TEX. BUS. & COM. CODE § 2.206(a)(2); *Enpro Systems, Ltd. v. Namasco Corp.*, 382 F. Supp. 2d 874, 880-81 (S.D.Tex. 2005).

Finally, the Court concludes that there is a genuine issue of material fact as to Yankee Candle's damages.  Section 2.714 of the UCC provides,

> (a) Where the buyer has accepted goods and given notification (Subsection (c) of Section 2.607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (b) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (c) In a proper case, any incidental and consequential damages under the next section may also be recovered.

According to UCC section 2.715,

> (a) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
>
> (b) Consequential damages resulting from the seller's breach include
>
> > (1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
> >
> > (2) injury to person or property proximately resulting from any breach of warranty.

Yankee Candle ordered shelves made from plywood and not particle board. Although ultimately it is Yankee Candle's burden to prove damages at trial, to prevail on summary judgment, Leggett initially has the burden of showing that Yankee Candle can adduce no evidence as to its damages. Leggett conclusorily states that the change from plywood to particle board was not a material change because it did not affect the shelves' performance, did not affect its value, and it improved the shelves' machinability/aesthetics. Leggett has not presented the Court with any competent summary-judgment evidence to support those assertions.[11]

On the other hand Yankee Candle has produced competent summary-judgment evidence that the change from plywood to particle board was at the very least a contributing factor in the shelves' delaminating.[12] Yankee Candle presented evidence that "the particle board was slightly undersized causing the veneer skin to bow around the steel hat channel causing additional stress on the skin relative to the frame." (Def.'s App. at 13.) Not only does this evidence suggest that the change to particle board may have caused

---

[11] Moreover, Leggett does not even explain what improvement in the shelves' "machinability" means, but it does suggest that any "machinability" benefit enured to Leggett's benefit and not Yankee Candle. Without more, the shelves' improved machinability could mean using the particle board made it easier and cheaper for Leggett to manufacture the shelves. It thus, could reasonably be inferred that a shelf made from particle board is of lesser value than one made from plywood.

[12] The Court notes that Yankee Candle has not contested that both shelves made with plywood and particle board delaminated. That does suggest that the change to particle board may not have caused the delamination. Although that could be the case, it doesn't mean that there isn't a genuine issue of material fact as to whether the change to particle board caused or contributed to the shelves' delaminating.

or contributed to the shelves' delaminating, but it also suggests that the shelves were of lesser quality and, thus, of lesser value. Under that circumstance, Yankee Candle would be entitled to the difference of the value of the shelves as provided for under section 2.714 of the UCC or to have all of the particle-board shelves replaced with plywood shelves as originally agreed to by the parties.[13]

Further, Yankee Candle asserted that it would cost it approximately $30,757 and 2020.5 work-hours to have its employees replace the shelves in all of its stores. Leggett's reply is that this expense was not caused by its breach because Yankee Candle would have to pay its employees anyway to perform "their duties regardless of the replacement of the defective shelves." (Pl.'s Reply at 7.) But that misses the point. It's irrelevant that Yankee Candle would be paying its employees regardless, what's relevant is that instead of performing their regular duties, they now have to reinstall new shelving because of Leggett's breach. That is a cognizable harm.[14]

---

[13] In its answer to Leggett's interrogatories, Yankee Candle maintained that it was "seeking $313,761 in damages due to the defective lightweight shelving provided it by Leggett. Because none of the lightweight shelves provided Yankee Candle by Leggett conform to the sample shelving Leggett furnished Yankee Candle, Leggett is obligated to replace all of the shelves." (Pl.'s App. at 9.)

[14] Leggett objects to the Court's consideration of Yankee Candle's evidence that it suffered travel expenses and shipping costs associated with the defective and nonconforming shelves because Yankee Candle failed to disclose this information during discovery. For purposes of summary judgment, the Court sustains that objection. Whether Yankee Candle should be permitted to present that evidence at trial because it failed to make the proper disclosures during discovery is matter Leggett may raise at trial or in a pretrial motion in limine.

Leggett argues that "Yankee Candle is simply trying to convert its warranty claims into fraud claims." (Pl.'s Br. at 6.) Leggett contends that Yankee Candle has failed to present any "evidence of any false representations by [Leggett that] were known by [Leggett] to be false or [that] were made recklessly as a positive assertion without any knowledge of its truth or that [Leggett] knowingly or intentionally failed to disclose facts it was required to dis- close." (*Id.*) Alternatively, Leggett argues that Yankee Candle "has sustained no injury or damages, since [Leggett] has supplied . . . significantly more replacement shelves than the number of shelves that have delaminated, at no cost to Yankee Candle." (*Id.* at 6-7.)

Yankee Candle argues that there is a genuine issue of material fact as to Leggett's fraud because Yankee Candle has submitted evidence that Leggett changed the design of the lightweight shelves without informing Yankee Candle. Yankee Candle contends, "Leggett had the opportunity each and every time Yankee Candle issued a purchase order for the shelves to inform Yankee Candle of the change and failed to do so." (Def.'s Br. at 16.) Yankee Candle

---

[15] Both parties present the same arguments to support their respective positions regarding a summary judgment against Yankee Candle's counterclaims for fraud and deceptive trade practices. Leggett contends that the change from plywood to particle board did not constitute a deceptive act just as it did not constitute fraud. Yankee Candle contends that it did. For the same reasons addressed in this section, the Court concludes that there is a genuine issue of material fact as to whether Leggett engaged in deceptive practices by making Yankee Candle believe the lightweight shelves would be designed using plywood, only to change the design to particle board without informing Yankee Candle.

also contends that it has offered evidence that it suffered damages as discussed in the breach-of-warranty section above.

Leggett replies arguing that Yankee Candle has failed to submit any evidence that Leggett knew the design of the lightweight self had changed and that Yankee Candle had relied on the original design of the shelves as provided in the samples when it decided to order the shelves from Leggett. Leggett continues to maintain that Yankee Candle has failed to show it suffered any damages.

In Texas, the elements of common-law fraud are:

> (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*In re FirstMerit Bank, N.A.* 52 S.W.3d 749, 758 (Tex. 2001). The burden is on the plaintiff to prove each and every element of fraud. *Allstate Insurance Co. v. Receivable Finance Co. LLC,* 501 F.3d 398, 406 (5th Cir. 2007).

> One who having made a representation which when made was true or believed to be so remains silent after he has learned that it is untrue and that the person to whom it is made is relying upon it in a transaction with him is morally and legally in the same position as if he knew that his statement was false when made. It is the prevailing law that one who learns that his statements are acted upon, to disclose the new conditions to the party relying on his original representations.

28

*Susanoil, Inc. v. Continental Oil Co.,* 519 S.W.2d 230, 236, n.6
(Tex.App.——San Antonio 1975, n.r.e.); *Cone v. Fagadau Energy Corp.,*
68 S.W.3d 147, 168 (Tex.App.——Eastland [11th Dist.] 2001, pet.
denied)("Even in the absence of a confidential relationship, when
one makes a representation, he has a duty to disclose new informa-
tion when he is aware the new information makes the earlier
representation misleading or untrue."). Yankee Candle has
submitted evidence that it sought from its numerous millwork
vendors proposals for a new lightweight shelf for use in its retail
stores. Leggett, in an effort to induce to Yankee Candle to
purchase its lightweight shelves, submitted sample shelves to
Yankee Candle for its inspection. These shelves were made of
plywood and not particle board and Leggett represented to Yankee
Candle that the plywood-designed shelf is what it would receive if
ordered from Leggett. Yankee Candle has submitted evidence that it
relied on its inspection of the samples provided and on the belief
that the samples accurately reflected the true design of the
shelves. And Yankee Candle presented evidence that it intended to
order the exact shelves Leggett provided in its samples. Yankee
Candle's purchase order specifically stated that Leggett's shelves
would "conform to all samples . . . furnished . . . ." (Def.'s
App. at 9.)

Further, Yankee Candle presented evidence that Indiana Chair
Frame, a subdivision of Leggett, changed the design of the

29

lightweight shelves from plywood to particle board. Because Indiana Chair Frame is a subdivision of Leggett, Leggett is rightfully charged with knowledge of the change. Moreover, Yankee Candle presented evidence that in June 2005, when the change occurred, Indiana Chair Frame notified Leggett of its decision to use particle board. Leggett never informed Yankee Candle of this change.

Finally, Yankee Candle has presented evidence that this change may have been material as it could have been a contributing factor in the shelves' delaminating and could have reduced the value of the shelves. For the reasons discussed in the breach-of-warranty section, Yankee Candle has presented evidence that it suffered damages, and there is evidence that the change to particle board was for the benefit of Leggett and not Yankee Candle.

III. Conclusion

For the foregoing reasons, the Court concludes that Leggett is entitled to summary judgment on Yankee Candle's breach-of-contract claims (Counts I and II). The Court further concludes that there is a genuine issue of material that the design change of the lightweight shelving may have caused or contributed to certain shelves' delaminating, may have reduced the value of the shelves, and have caused Yankee Candle to suffer damages. Therefore, Leggett is not entitled to summary judgment on Yankee Candle's

claims for breach of warranty, fraud, and unfair and deceptive trade practices.

SIGNED March 17, 2008.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE